FIRST NATIONAL BANK *v.* MYERS.

4-3975

Opinion delivered October 7, 1935.

*John W. Goolsby* and *James B. McDonough*, for appellant.

*Karl Greenhaw* and *Geo. W. Johnson*, for appellees.

MEHAFFY, J.  On January 27, 1934, the appellees began this suit against the Jim Fork Coal Company, a cor-

poration engaged in the business of mining coal in Sebastian County, Arkansas. Their cause of action was for labor performed in the mine of the mining company.

The law provides that any person or persons working in any mine of the State of Arkansas or in any quarries, either stone or marble, shall have a lien on the output of any such mine or quarries and the lien shall attach to all the machinery, tools and implements. Section 7293, Crawford & Moses' Digest.

Thereafter an amendment was filed on February 1, 1934, making E. J. Darnell a party plaintiff.

On February 3, 1934, the Jim Fork Coal Company filed answer agreeing to the appointment of a receiver, although it claimed it was not insolvent. On February 3 a receiver was appointed, and on February 8, 1934, the receiver filed his report. The receiver reported that the value of the development of said mine was $11,451; that the personal property was of the value of $36,307; the lease was not appraised; the indebtedness of the coal company at that time was $25,404.29. According to the receiver's report, the value of the mining company's property, in addition to the value of the lease, was $22,-353.71 in excess of its indebtedness. The receiver stated in his report that the mine was developed to such a point that it might be easily operated with a profit, and asked permission to issue receiver's certificates for the sum of $1,000.

On April 4, 1934, a motion to require a sale of the receivership property was filed, and it was stated that the mine had not been operated. On April 12 the receiver filed a response to the motion to require sale, alleging that he would not be able to operate the mine, and that the expense of maintaining the property was excessive, and it should be disposed of at the earliest opportunity; that he attempted to sell or lease the property and had been unable to do so; that there were two outstanding mortgages on the property past due; that, in order to dispose of the property, it was necessary that the First National Bank and others be made parties.

On March 14, 1934, the receiver reported that it appeared impossible to operate the mine; that it was cost-

ing about $40 a day to preserve the property, and that the receiver had contracted an indebtedness of approximately $1,465 for labor, repairs and power.

Interventions were filed by numerous parties, among others the Southwestern Gas & Electric Company. It claimed that the mining company owed it $4,686.18 for electric energies used prior to the receivership.

On April 23, 1934, the appellant filed an intervention alleging that the mining company was indebted to it, the indebtedness being evidenced by a note and mortgage dated September 14, 1929; that the original indebtedness was $2,500 but that $1,000 had been paid, leaving an indebtedness of $1,500 and interest. The note was due June 1, 1933, and bore interest at the rate of 10 per cent. per annum from maturity until paid. The intervener, First National Bank, prayed that, if a sale of the property was made, all the properties embraced in its mortgage be segregated and sold separately and the proceeds of the sale held by the court in trust for the mortgagee and that funds derived from such sale be applied on its mortgage debt of $1,500 and interest.

There were two efforts made to sell the property at public sale, and thereafter an order was made to sell at private sale, and the property was sold at private sale, and the property included in the mortgage to the First National Bank was sold for the sum of $1,566.40. The entire property sold for $2,292.35.

We deem it unnecessary to set out the interventions of the different parties, because the only question involved on this appeal is whether the expenses of the receiver constitute a lien superior to the mortgage lien of the First National Bank.

The regular chancellor certified his disqualification, and the Honorable George W. Dodd was elected special chancellor to try the case.

The first error alleged as ground for reversal is that, after the decree was rendered, the term of court ended and another term begun before the decree on May 12, and that the chancellor was without power to change his former decree. There is no merit in this contention. The first decree simply held that the bank, the mortgagee, had

a lien on all the property included in its mortgage that was superior to the lien of all persons interested in the suit. The persons interested at that time were the laborers and other creditors, and the court found that the bank's lien was superior to their lien, and the chancellor reserved the question now before the court.

The other question presented for our consideration is whether the bank's lien is superior to the lien for receivership expenses. It is argued by the appellee that these expenses were necessarily incurred to protect the property of the mining company; that the bank, through its officers, knew all about it; that the receiver was cashier of the bank, and that John Conroy was a stockholder and director in the bank; that they acquiesced in the proceedings, hoping that it would be beneficial to them. Conroy was superintendent and manager of the Jim Fork Coal Company, and was acting for the coal company, and not for the bank.

A bank is not bound by the acts of its cashier which are not within the apparent authority of the cashier, and which it has neither authorized nor ratified. The acts of the cashier in accepting the receivership of the mining company was not within the apparent authority, and this record does not show that the bank either authorized or ratified these acts of the cashier. 7 C. J. 551.

Whatever the cashier did with reference to the mining company was in no way connected with the bank, but was a matter in which he was personally interested. 7 C. J. 552.

In discussing the authority of the cashier of a bank, the Missouri court said: "The law will not permit an agent's private interests to come between himself and his principal. Its actual presence always disables the agent from binding his principal." *Lee* v. *Smith,* 84 Mo. 304, 54 Am. Rep. 101.

"A corporation is not chargeable with the knowledge nor bound by the acts of one of its officers in a matter in which he acts in behalf of his own interests and deals with the corporation as a private individual and in no way represents it in the transaction." *Buffalo County Nat. Bank* v. *Sharpe,* 40 Neb. 123, 58 N. W. 734.

In 7 C. J. 557, is the following statement: "This rule is founded on the familiar rule of the law of agency which forbids that an agent shall act for himself and for his principal in one and the same transaction. It is founded on sound consideration of public policy and the recognized inability of any person to faithfully serve two masters at the same time. Consequently, when the cashier issued these drafts, he did so without authority, and his conduct is to be viewed in no more favorable light than that of any other person who, without authority, appropriates the property of another to his own use."

This action was begun against the mining company by laborers, and there is no evidence that the bank had any knowledge of it. The plaintiffs in the case asked for the appointment of a receiver, alleging the insolvency of the mining company. The mining company filed answer denying its insolvency, but agreed to the appointment of a receiver. Mr. Savage, who was cashier of the bank, was appointed receiver and acted as such. This was on February 3, 1934. There is no evidence that the bank had any knowledge of it, and there is no evidence that the cashier himself knew anything about it until he was appointed. This was no part of his duties as cashier of the bank, and this act alone would not bind the bank.

Appellee calls attention to 23 R. C. L. 76, but immediately following the statement quoted by appellee is the following: "But the duty to preserve the property by no means includes the right to create debts for other purposes."

Appellees also call attention to 23 R. C. L. 86 with reference to receiver's certificates. The power of the chancery court to authorize the receiver to issue certificates which shall become paramount liens grows out of its duty to protect and preserve the property. There was no occasion or no reason to protect and preserve the property of the bank because the property was ample to secure the debt to the bank, and the bank was protected by its mortgage.

Section 7393 of Crawford & Moses' Digest is as follows: "In the absence of stipulations to the contrary,

the mortgagee of personal property shall have the legal title thereto and the right of possession.''

The bank had the legal right to the possession of this property, and there is this provision in the mortgage: ''The mortgagor hereby agrees to the following conditions which are made part of this mortgage: 1. The mortgagor shall, until default herein, keep the actual possession and control of said property, including the increase of all female property, and shall keep the same in good condition.''

The mortgage was past due, default had been made, and the bank had the right to the possession of the property, and it had the legal title thereto.

So far as this record shows, the first thing the bank did with reference to this suit was to file an intervention and ask for the foreclosure of its mortgage. It asked that the property included in the mortgage be segregated and sold separately and the proceeds of the sale applied on the mortgage debt.

When the receiver was appointed, he made an inventory, and apparently all parties that knew anything about it believed that it would be to the best interest of the creditors to operate the mine. They soon, however, found out that this could not be done. The appointment of a receiver and the operation of the mine was not for the protection of the bank's debt, because it had a mortgage on the property of sufficient value to pay its debt. The mortgage was past due, default had been made, and under the law the bank had the right, when this suit was brought, to take possession of the property and sell it and apply the proceeds of the sale to the satisfaction of its debt.

Since it was thought that the operation of the mine might be beneficial to other creditors and would not in any way prevent the bank from collecting its debt, the bank probably would have agreed to the operation. If it had, this would not bind it to pay expenses of the receiver to preserve and protect the property of the other creditors. Not only was there no reason for a receiver, in order to protect the property of the bank, but practically all the property included in the bank's mortgage was of

such a character that the furnishing of electricity by the electric company would not in any way benefit the bank or have the effect of protecting or preserving its property. Its property consisted largely of property outside the mine. There were seven mules, six sets of harness, one mine tipple, one screen shaker, and numbers of other articles that were in no way protected or benefited.

Appellee calls attention to the case of *Buster* v. *Mann*, 69 Ark. 23, 62 S. W. 588. The property involved there was a sawmill, and was mortgaged to secure a debt. In that case the only property involved was that included in the mortgage, and the mortgagee had consented to the appointment of a receiver and the operation of the mill. The court said: "Under these circumstances, we think the debts of the receiver should be paid out of the assets in the hands of the receiver before anything is paid on the debt of Mann, Moon & Co. In reaching this conclusion we by no means approve of the order authorizing the operation of this mill. Courts are not required to operate sawmills, and the disastrous consequences that resulted from the operation of this mill by the receiver illustrates the evil and danger of such a proceeding. But the order was doubtless made because no one objected, and the creditor that consented has no right to complain at the expense necessarily entailed."

It was held that the expenses of the receiver took precedence over the mortgage debt in that case, but the entire property was mortgaged and the mortgagee consented to the operation of the mill by the receiver.

In the instant case there was a great deal of property in addition to that described in the mortgage, and there is no evidence that the bank consented to the operation of the mine by the receiver. Moreover, in the instant case the mortgage was past due, and the bank had the legal right at any time to take possession of the property.

The next case to which appellee calls attention is *German National Bank* v. *Young*, 114 Ark. 370, 169 S. W. 1178. That case has no application.

Appellee also calls attention to *Crow* v. *Rogers*, 181 Ark. 633, 26 S. W. (2d) 1112, and *Rogers* v. *Ownby*, 190

Ark. 1144, 83 S. W. (2d) 818. The question here was not involved in either of those cases, and not discussed.

Under the law the bank's mortgage lien was superior to that of the electric company and all others. The bank was entitled to foreclose its mortgage, and is entitled to the proceeds of the sale of the property included in its mortgage. The bank, however, spent some money protecting its property, and this is a proper charge against the bank. It expended $173.25 for removing property, $61.80 mule feed and $25 paid Hefley for services in effecting a private sale. These sums the bank is liable for.

The decree of the chancery court is reversed, and the cause is remanded with directions to pay the bank the amount of its judgment less the above amounts necessarily expended in protecting its property.

It is so ordered.